UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEPHANIE A., <br><br> Plaintiff, <br><br> v. <br><br> KILOLO KIJAKAZI, <br><br> Defendant. | Case No.: 3:22-cv-00349-BGS <br><br> **ORDER ON JOINT MOTION FOR JUDICIAL REVIEW** <br><br> **[ECF 19]** |

On March 16, 2022, Stephanie A.[1], Plaintiff, filed a Complaint in this case. (ECF 1.) She consented to Magistrate Judge Jurisdiction (ECF 5), and on August 8, 2022, the United States Attorney's Office filed the Administrative Record (ECF 13). On January 20, 2023, the parties filed a Joint Motion for Judicial Review. (ECF 19.) For the following reasons, the ALJ's decision is **VACATED**, and the case is **REMANDED** to the ALJ for further proceedings consistent with this opinion.

I. **PROCEDURAL BACKGROUND**

On April 18, 2018, Plaintiff, then-employed as a Teacher Aide, filed an application for a period of disability and disability insurance benefits, alleging disability beginning on May 10, 2018. (Administrative Record (AR) at 133.[2]) In the October 15, 2021, decision of Administrative Law Judge (ALJ) Randolph E. Schum, Plaintiff, currently age 47, was

---

[1] The Court refers to Plaintiff using only her first name and last initial. CivLR 7.1(e)(6)(b).
[2] The AR was filed on August 8, 2022. (ECF 13.) Citations to the AR are to the original document pagination and not to the Case Management/Electronic Case Filing (CM/ECF) pagination. The Court's other citations are to the CM/ECF pagination and docket number.

1

found to have the severe impairments of a history of Sjögren's syndrome and hypocomplementemia, a history of Grade I diastolic dysfunction, anxiety disorder, post-traumatic stress disorder, and depressive disorder. (ECF 13-2 at 24.)

Plaintiff's initial application was denied by an examiner on August 22, 2018, and again on reconsideration, on December 12, 2018. (*Id.*) Plaintiff requested a hearing before an ALJ. (*Id.*) On August 27, 2019, ALJ Schum held a hearing, and on November 1, 2019, issued a decision concluding that Plaintiff is not disabled. (*Id.* at 146.) Plaintiff appealed the ALJ's decision to the Appeals Commission, and on May 11, 2020, the Appeals Commission vacated the ALJ decision and remanded the case to ALJ Schum (AR at 153-54).

On April 20, 2021, on remand, the ALJ held another hearing. (AR at 68.) Vocational expert Linda M. Ferra, M.A. (VE 1), provided expert vocational testimony at the hearing. (*Id.* at 35.) A few weeks after the hearing, on May 14, 2021, Plaintiff submitted a brief to the ALJ that addressed VE 1 testimony at the hearing. Because of the brief, the ALJ held a supplemental hearing on August 24, 2021. About a week after the supplemental hearing, on September 3, 2021, Plaintiff filed another brief.

According to the ALJ, Plaintiff's first supplemental brief consisted of "objections to the testimony of the vocational expert, [Ms. Ferra.]" (*Id.* at 20.) Plaintiff's brief argued that VE 1's testimony "lacked the support of substantial evidence." (*Id.* at 20-21.) The ALJ "overrule[d] [the] objection" because Plaintiff had the opportunity to raise the argument while cross-examining VE 1 at the hearing. (*Id.* at 21.) But, due to the later "admission of evidence," the ALJ nevertheless held a supplemental hearing. (*Id.*) At the supplemental hearing, vocational expert Ronald K. Hatakeyama, Ph.D. (VE 2), testified. (*Id.*) According to the ALJ, the brief Plaintiff filed after the supplemental hearing raised "basically the same grounds as [those raised] in the prior memorandum." (*Id.*)

The ALJ issued a decision on October 15, 2021, the Appeals Council denied review on December 10, 2022, and the case is now before the Court.

## II.   FIVE-STEP SEQUENTIAL EVALUATION PROCESS

"When considering a claim for disability benefits, the Social Security Administration is required to conduct a now-familiar five-step sequential evaluation process to determine whether a claimant is disabled and eligible for benefits." *Shaibi v. Berryhill*, 883 F.3d 1102, 1106 (9th Cir. 2017) (citing 20 C.F.R. § 404.1520(a)). "First, the agency must consider the claimant's current work activity." *Id.* "Second, the agency must consider the medical severity of the claimant's impairments." *Id.* "Third, the agency must determine whether the severity of those impairments is sufficient to meet, or medically equal, the criteria of an impairment listed in three of the Social Security Act's implementing regulations, published at 20 C.F.R. §§ 404.1520(d), 404.1525-26." *Id.* "Fourth, the agency determines whether the claimant can perform past relevant work in light of the claimant's residual functional capacity [(RFC)]." *Id.* "Fifth, the agency assesses whether the claimant can make an adjustment to other work that exists in significant numbers in the national economy, based on the claimant's residual functional capacity." *Id.* "The claimant carries the initial burden of proving a disability in steps one through four of the analysis." *Id.* (internal quotation marks omitted). "However, if a claimant establishes an inability to continue her past work, the burden shifts to the Commissioner in step five to show that the claimant can perform other substantial gainful work." *Id.* (internal quotation marks omitted).

In this case, under step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity during the period from the alleged onset of her disability on May 10, 2018, through the date last insured of June 30, 2020. (AR at 23.) Under step two, the ALJ found that Plaintiff had the severe impairments of a history of Sjögren's syndrome and hypocomplementemia, a history of Grade I diastolic dysfunction, anxiety disorder, post-traumatic stress disorder, and depressive disorder. (*Id.*) Under step three, the ALJ found that the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at 25.)

The ALJ then found that Plaintiff has the RFC

>to perform sedentary work as defined in 20 CFR 404.1567(a). She could lift and carry ten pounds occasionally and less than ten pounds frequently. She could sit for at least six hours in an eight-hour workday and stand and/or walk up to two hours in an eight-hour workday. She should never climb ladders, ropes or scaffolds; occasionally climb ramps and stairs; and occasionally balance, stoop, kneel, crouch and crawl. She should avoid concentrated exposure to extreme cold temperatures, loud noise and vibration and even moderate exposure to unprotected heights and moving or dangerous machinery. Additionally, she could understand, remember and carry out simple instructions for simple tasks, she could respond appropriately to co-workers and supervisors in a task[-]oriented setting where contact with others was casual and no more than occasional and she should not work in a setting which included constant/regular contact with the general public or more than occasional handling of customer complaints.

(*Id.* at 26.)

Under step four, the ALJ found that given Plaintiff's RFC, she was unable to perform the requirements of her past relevant work. (*Id.* at 35.) Under step five, to establish that there are jobs in "significant numbers" in the national economy that a claimant can perform, "the ALJ can call upon a vocational expert to testify as to: (1) what jobs the claimant, given his or her residual functional capacity, would be able to do; and (2) the availability of such jobs in the national economy." *Tackett v. Apfel*, 180 F.3d 1094, 1104 (1999).

At the first hearing on remand to the ALJ, VE 1 testified that given Plaintiff's age, education, work experience, and RFC, Plaintiff could perform the requirements of the representative occupations of an Assembler (Dictionary of Occupational Titles (DOT) 734.687-018), a Table Worker (DOT 739.687-182), or an Addresser (DOT 209.587-010). VE 1 testified that there were approximately 5,000 unskilled, sedentary Assembler jobs, 6,000 Table Worker jobs, and 7,000 Addresser jobs in the national economy, for a total of 18,000 jobs in the national economy that the claimant would be able to do. (AR at 37.)

At the supplemental hearing, VE 2 testified that Plaintiff could perform the requirements of the representative unskilled, sedentary occupations of Bench Assembler

(DOT 739.687-182) and Lens Inserter (DOT 713.687-026). He testified that there were approximately 12,000 Bench Assembler jobs and 11,000 Lens Inserter jobs available in the national economy, for a total of 23,000 jobs in the national economy that the claimant would be able to do. (*Id.*)

The ALJ concluded that Plaintiff would be able to do the jobs identified by VEs 1 and 2. The total number of national jobs is 29,000 (or, at most, 35,000).[3] (ECF 13-2 at 38.)

### III. ISSUE I

Plaintiff argues in relevant part that the ALJ erred by failing to reconcile the conflict between VE job-numbers estimates and her job-numbers evidence, which she provided in a supplemental brief to the ALJ after the ALJ's second hearing on remand. (ECF 19 at 6-7.) Plaintiff argues that her evidence was "significant and probative." (ECF 19 at 7-8.) As a result, she argues this case must be remanded to the ALJ to resolve the conflict between the job-numbers estimates she has provided and the VE's estimates. (*Id.* at 22.)

**A. Legal Standard**

Because "a claimant will rarely, if ever, be in a position to anticipate the particular occupations a VE might list and the corresponding job numbers to which a VE might testify at a hearing," as long as a claimant raises the job-numbers issue in a general sense before the ALJ, an ALJ will ordinarily "permit a claimant to submit supplemental briefing . . . contrasting the VE's specific job estimates with estimates of the claimant's own." *Shaibi*, 888 F.3d at 1110. If a claimant has introduced job-number estimates, an ALJ "may have a duty to [resolve a conflict between the VE's job-number estimates and the claimant's job-number estimates]." *Wischmann v. Kijakazi*, 68 F.4th 498, 505 (2023). However, "[t]hat

---

[3] To get 29,000 jobs, the Court uses the 6,000 job-number estimate for DOT 739.687-182 provided by VE 1 instead of the 12,000 job-number estimate provided by VE 2. Both VEs testified that Plaintiff could do the job of DOT 739.687-182. VE 1 testified that DOT 739.687-182 was the "Table Worker" job, and that there were 6,000 Table Worker jobs nationwide. VE 2 testified that DOT 739.687-182 was the "Bench Assembler" job, and that there were 12,000 Bench Assembler jobs nationwide. (*See* ECF 19 at 14 ("[B]oth the first and second VE identified the occupation at DOT code 739.687-182, yet identified different job numbers . . . .").)

duty arises only where the purportedly inconsistent evidence is both significant and probative, as opposed to 'meritless or immaterial.'" *Id.* (quoting *Kilpatrick v. Kijakazi*, 35 F.4th 1187, 1193-94 (9th Cir. 2022)). If estimated job numbers lack a sufficient foundation, they are not probative. *Id.* at 505; *see Kilpatrick*, 35 F.4th at 1194 (holding that a claimant's job-number estimates were not probative because the claimant's attorney produced the estimates and had no identified expertise in calculating job figures in the national economy, used seven-year-old data, and used a method based on "improbable assumptions"). "In cases where the conflicting job-number estimates were accepted as probative, [courts] [turn] to the question whether the new evidence [is] significant, which in the context of job-number estimates is a measure of the discrepancy between the VE's estimates (upon which the ALJ relied to render the step-five finding) and the claimant's estimates." *Wischmann*, 68 F.4th at 505. This Court must determine whether Plaintiff's estimates are "both significant and probative, which would require a remand to the ALJ to reconsider his step-five finding that there were a significant number of jobs in the national economy that [Plaintiff] could perform." *See id.* at 507.

In *Wischmann*, the Court held that because the evidence was not probative, it did not "give rise to the sort of inconsistency in the evidence that an ALJ is required to resolve" and there was no need to remand the case to the ALJ. *Wischmann*, 68 F.4th at 506. The claimant's evidence of job-number estimates in *Wischmann* consisted mostly of raw data that was incomprehensible to a lay person. *Id.* at 507. The data used a different methodology than the VE in that case had used. *Id.* Other than by stating the software program that had been used, the evidence did not explain how the job numbers were produced. *Id.* Plaintiff's attorney failed to give information about which queries were entered in the program, whether any variables were changed, whether any filters were applied to the data, and which version of the program was used. *Id.*

**B. Analysis**

**1. Plaintiff's Job-Numbers Data**

In this case, Plaintiff used the Job Browser Pro software program to generate job-

number estimates. Her job-numbers evidence shows that the total 2021 employment estimate for Table or Bench Assembler (DOT 739.687-182) in the "U.S. National" industry is 962. (AR at 723.) Her evidence shows that the total 2021 employment estimate for Lens Inserter (DOT 713.687-026), in the "U.S. National" industry is 24. (AR at 726.) At the second hearing, VE 2 testified that he "primarily [relies] on Job Browser Pro," but that "if there are outliers in Job Browser Pro," he would use his use "own labor market information." (AR at 55.) He testified that Job Browser Pro indicated "NA or not applicable" for Bench or Table Worker and Lens Inserter. (*Id.*) He noted that he was "not quite sure if they don't have the data." (*Id.*) As a result, he had to "rely on [his] professional experience in looking at these types of jobs." (*Id.*) He relied on companies in the local area to give him information for the two jobs and had graduate students in the college courses he teaches do labor market surveys. (*Id.*) He "believe[s] that the numbers are reliable." (*Id.* at 57.) VE Hatakeyama testified that Plaintiff could perform the requirements of Table or Bench Assembler (DOT 739.687-182) and Lens Inserter (DOT 713.687-026). He testified that there were approximately 12,000 Bench Assembler jobs and 11,000 Lens Inserter jobs available in the national economy, for a total of 23,000 jobs in the national economy that the claimant would be able to do. (*Id.*)

In *Thomas S.*, a district court from the District of Oregon held that results derived from using "a software program the VE testified to using and [entering] the same DOT positions for the same period" which showed fewer than 1000 positions for three occupations compared to 323,000 positions derived from the VE's search was significant probative evidence. *Thomas S. v. Comm'r*, No. 6:22-cv-00833, 2023 WL 4074769, at *4 (D. Or. June 18, 2023). The plaintiff in that case had used Job Browser Pro, a source the VE in that case also used, had entered the same DOT positions given by the VE, and had retrieved job numbers for 2020, the period for which the VE had last updated his numbers. *Id.* at *3-4. Although the VE had relied on Job Browser Pro and OASYS and the plaintiff's attorney had used only Job Browser Pro, the court explained that "the Ninth Circuit has not held that the plaintiff must precisely replicate the VE's methodology," only that the

plaintiff must "submit significant probative evidence," *id.* at *4, citing in support *Buck v. Berryhill*, 869 F.3d 1040, 1052 (9th Cir. 2017) (remanding where the plaintiff submitted vastly different job numbers from those provided by the VE, "presumably from the same source"), and distinguishing *Kilpatrick* (affirming the ALJ's denial of benefits where plaintiff's counsel used a suspect methodology and relied on seven-year-old data to calculate job numbers).

Although Plaintiff's job-number estimates were not produced by a VE, as was the case in *Wischmann* and *Kilpatrick*, unlike the claimant's attorney in *Wischmann*, Plaintiff's attorney did use the same software program and methodology both VEs used; VE 2 initially used Job Browser Pro and VE 1 testified that it was one of several she used. Plaintiff's job-number estimates appear to have been derived from Job Browser Pro general queries for the DOT job numbers identified by the VEs for Table or Bench Worker and Lens Inserter. Furthermore, it does not appear from Plaintiff's evidence that he applied any filters and an updated version of the software, Job Browser Pro, Version 1.7.3.1, was used. (ECF 19 at 12.) The method used by Plaintiff is more akin to the method used by the plaintiff in *Thomas S.* The Court concludes that Plaintiff's evidence is probative. *See Wischmann*, 68 F.4th at 505.

The evidence is also significant: VE 2 testified that there were approximately 12,000 Bench Assembler jobs and 11,000 Lens Inserter jobs available in the national economy, VE 1 testified there were 12,000 Table Worker jobs in the national economy, and Plaintiff's evidence shows 962 Table or Bench Assembler or Table Worker jobs and 24 Lens Inserter jobs in the national economy. *See Buck v. Berryhill*, 869 F.3d 1040, 1046-47, 52 (9th Cir. 2017) (remanding to ALJ to resolve the conflict between VE job-number estimates and claimant job-number estimates because "the vast discrepancy between the VE's job numbers and those tendered by [the claimant] [(the VE testified there were 843,800 jobs nationally for three identified jobs and the claimant's evidence showed 2,296)], presumably from the same source, [was] simply too striking to be ignored).

Assuming Plaintiff's job number estimates are accurate, the total number of national

jobs is 12,986.[4]  The Ninth Circuit has noted that whether 25,000 national jobs is sufficient to be considered significant numbers in the national economy "presents a close call." *Gutierrez v. Comm'r of Soc. Sec.*, 740 F.3d 519, 529 (2014).  Based on a total of 12,986 jobs, there is a reasonable probability that the outcome of Plaintiff's proceeding may have been different had the ALJ resolved the conflict between the VEs' job numbers and Plaintiff's.  *See White v. Kijakazi*, 44 F.4th 828, 837 (9th Cir. 2022).  It is, therefore, necessary to remand this case to the ALJ to consider Plaintiff's evidence.  *Id.*

**2. Addresser Job and VE 1 and 2 Testimony**

a. Addresser Job

Plaintiff also argues that VE 1's testimony regarding the Addresser job fails to satisfy the ALJ's burden at step five.  (ECF 19 at 9.)  She suggests that VE 1's testimony that "a person might use some sort of computer to produce rather than a typewriter because I think that nobody uses a typewriter anymore," may have "[elevated] this unskilled job to semi-skilled," which she notes, VE 1 did not address.  (*Id.* at 10.)  She also suggests that the Addresser job might be obsolete, and that the 7,000 national jobs identified by VE 1 are, therefore, not based on substantial evidence.  (*Id.*)  As Defendant points out, the Ninth Circuit (by unpublished decision), has held that although the Addresser job has an "antiquated reference to typewriters," an ALJ was entitled to rely on a VE's testimony that the Addresser job existed in significant numbers in the national economy.  *Gallo v. Comm'r of Soc. Sec. Admin.*, 449 F. App'x 648, 650 (9th Cir. 2011).  The Court then noted that, although VE testimony may become unreliable due to a conflict with the DOT, it does not become unreliable because of its compliance with the DOT.  *Id.*  Here, VE 1's testimony was consistent with the DOT.  Plaintiff has provided no legal basis for the Court to vacate the ALJ's decision on this issue.

b. VE 1 Testimony

---

[4] VE 1 identified 5,000 Assembler jobs and 7,000 Addresser jobs nationally, which when combined with Plaintiff's estimates of 962 Table or Bench Assembler jobs and 24 Lens Inserter jobs nationally, totals 12,986.

Plaintiff argues that VE 1's job-numbers testimony is not substantial evidence because VE 1 testified that she calculates job numbers based on what is "fair" to both the claimant and the Social Security Administration (ECF 19 at 9), is unconvincing. The Court has reviewed the hearing transcript where VE 1 states that her testimony is consistent with the Dictionary of Occupational Titles and the Selected Characteristics of Occupations. (AR 84.) Specifically, VE 1 testified that her methodology is to "start with the OES/Occupational Employment Statistics," then use sources including Job Browser Pro, U.S. Publishing, County Business Patterns, and other information she gets from the Department of Labor to choose jobs she knows exist. Then, based on those sources, she comes up with a number of jobs that she believes is "fair to both the Social Security Administration and the Claimant." (AR 84.) Given her expertise and reliance on the above sources, there is no merit to Plaintiff's suggestion that VE 1's use of the word "fair" precludes her testimony from qualifying as substantial evidence.

   c. VE 2 Testimony

Plaintiff suggests that VE 2's testimony is not "substantial evidence of the number of jobs that exist in the national economy," *Ford v. Saul*, 950 F.3d 1141, 1159 (9th Cir. 2020), because VE 2 would not disclose the research and documents used when coming up with his job numbers." (ECF 19 at 13.)

There is no "'categorical rule, applying to every case in which a vocational expert refuses a request for underlying data,' which would make an expert's testimony per se unreliable." *Ford*, 950 F.3d at 1159 (quoting *Biestek v. Berryhill*, 587 U.S. ___, ___ (2019)). The inquiry is case-by-case, and the court must consider the evidence on the record in each case, including whether "the expert's testimony lacks markers of reliability" and whether "the expert has no good reason to keep the data private." *Id.*

Here, VE 2 refused to disclose his research and documents used to get his job numbers because his students' work is not for publication, and because he must abide by a professional code of ethics and his job analysis for particular companies was "proprietary information," which he would not disclose to Plaintiff's attorney. (*Id.* at 62.) These

reasons suffice as a "good reason to keep the data private," and Plaintiff fails to show that VE 2's testimony is otherwise not reliable.  *See id.*

### IV.  ISSUE II

Plaintiff contends that the ALJ did not articulate clear and convincing reasons, supported by substantial evidence, for rejecting Plaintiff's pain and limitation testimony.

**A.  Legal Standard**

The ALJ must engage "in a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible."  *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014).  At the first step, the ALJ must determine whether a claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged.  *Id.* (citing *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007)).  If the claimant satisfies the first step and there is no determination of malingering by the ALJ, "the ALJ must provide 'specific, clear and convincing reasons for' rejecting the claimant's testimony regarding the severity of the claimant's symptoms."  *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1102 (9th Cir. 2014) (quoting *Lingenfelter*, 504 F.3d at 1036).

The Ninth Circuit "require[s] the ALJ to 'specifically identify the testimony from a claimant [the ALJ] finds not to be credible and . . . explain what evidence undermines this testimony."  *Id.* at 1102 (internal quotation marks omitted) (omission and alterations in original); *Lambert v. Saul*, 980 F.3d 1266, 1268 (9th Cir. 2020) ("[T]he ALJ must identify the specific testimony that he discredited and explain the evidence undermining."); *Smolen v. Chater*, 80 F.3d 1273, 1284 (1996) ("The ALJ must state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion."); *Parra v. Astrue*, 481 F.3d 742, 750 (9th Cir. 2007) ("The ALJ must provide clear and convincing reasons to reject a claimant's subjective testimony, by specifically identifying what testimony is not credible and what evidence undermines the claimant's complaints.").

**B. Parties' Positions**

At the hearing, Plaintiff indicated that because of Sjögren's Syndrome, she suffers from "really bad fatigue and really bad muscle and joint pain." (AR 74.) She described fatigue as "the most debilitating" and "all-consuming" of her symptoms. (*Id.*) When Plaintiff suffers from extreme fatigue during the day, she does not have the energy to dress, bathe, or to care for her hair or shave. (AR 390.) Sometimes she goes almost a week before she has the energy to do any of those things. (*Id.*)

Plaintiff contends the ALJ failed to offer clear and convincing reasons for rejecting her testimony about the severity of her fatigue. (ECF 19 at 24.) Defendant argues that the ALJ articulated valid reasons for discounting Plaintiffs subjective complaints. (*Id.* at 29.) The ALJ compared Plaintiff's subjective allegations to the objective medical evidence and other evidence and provided 11 reasons for not fully adopting Plaintiff's allegations of disabling fatigue, muscle and joint pain. (AR 33-34.)

**C. Analysis**

The ALJ found that, "After careful consideration of the evidence, the undersigned found that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (AR 35.)

Of significance, the ALJ never identified Plaintiff's allegations that she suffered from severe fatigue before he discounted them. The Ninth Circuit "require[s] the ALJ to 'specifically identify the testimony from a claimant [the ALJ] finds not to be credible and . . . explain what evidence undermines this testimony." *Treichler*, 775 F.3d at 1102. His failure to specify this testimony before discounting it is legal error.

Further, the ALJ offered 11 specific and legitimate reasons for discounting Plaintiff's testimony, the ALJ fails to indicate which evidence undermines the fatigue testimony. However, he does not even mention in those 11 reasons her alleged symptom of severe fatigue. (AR 33-34.) Nor does the ALJ explain what evidence undermines this

testimony. He does as part of his first reason find that her daily activities do not indicate a disabling level of impairment of her RFC. But not only does he not identify how her daily activities contradict her testimony of suffering from severe fatigue, he also doesn't address her statements that when Plaintiff suffers from extreme fatigue, she does not have the energy to dress, bathe, hair care, or shave. (AR 390.) Sometimes she goes almost a week before she has the energy to do the aforementioned personal care. (AR 390.) *See Cobb v. Colvin*, No. CV 14-0655 RNB, 2014 WL 5659414, *2 (C.D. Cal. Nov. 4, 2014) (holding that the ALJ erred by finding that the plaintiff's statements that were inconsistent with the ALJ RFC were not credible because the ALJ "ignored the fully context of [the] plaintiff's statements about his daily activities, which indicated that he performed them on a limited basis with help and rest").

The ALJ's remaining 10 reasons address other symptoms, but not her testimony about her fatigue. (*See* AR 33-34.) Defendant attempts to justify this lack of explanation, "Given the questionable nature as to the cause of Plaintiff's allegations of fatigue and joint and muscle pain, the ALJ properly considered all of the physical objective evidence in assessing her statements." (ECF 19 at 32.) The ALJ has the obligation to not only specify what testimony he seeks to discount, but also what evidence undermines that testimony. The ALJ failed to do both as regards Plaintiff's testimony about her severe fatigue.

Further, the Court concludes that remand is required. "The rare circumstances that result in a direct award of benefits are not present in this case." *See Leon v. Berryhill*, 880 F.3d 1041, 1047 (9th Cir. 2017).[5] As discussed above, the ALJ failed to properly

---

[5] There are three requirements for remanding a case to the agency for an immediate award of benefits. *Brown-Hunter v. Colvin*, 806 F.3d 487, 495 (9th Cir. 2015). This case satisfies the first requirement because the ALJ neglected to "provide legally sufficient reasons for rejecting [fatigue] evidence . . . [from] claimant testimony." *See id.* The second requirement is that the Court consider "whether there are 'outstanding issues that must be resolved before a disability determination can be made' and whether further administrative proceedings would be useful.'" *Leon*, 880 F.3d at 1047 (quoting *Treichler*, 775 F.3d at 1101). "In evaluating this issue, [the Court] consider[s] whether the record as a whole is free from conflicts, ambiguities, or gaps, whether all factual issues have been resolved, and whether the

evaluate Plaintiff's subjective testimony. The ALJ's findings are inadequate and further administrative review may remedy the ALJ's errors, making remand appropriate in this case. The Court is not going to create reasons that the ALJ did not give or support in his findings. Further administrative proceedings are necessary to allow the ALJ to do this evaluation. The Court concludes that remand is proper in this case, since not all factual issues have been resolved and it is not clear whether the Plaintiff is entitled to benefits under the applicable legal rules. *See Treichler*, 775 F.3d at 1104-05.

## V. CONCLUSION

The ALJ's decision is **VACATED**. This case is **REMANDED** to the ALJ for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

Dated: September 26, 2023

Hon. Bernard G. Skomal
United States Magistrate Judge

---

claimant's entitlement to benefits is clear under the applicable legal rules." *Treichler*, 775 F3d at 1104-05. "Where . . . an ALJ makes a legal error, but the record is uncertain and ambiguous, the proper approach is to remand the case to the agency." *Id.* at 1105. Here, where the ALJ's findings regarding Plaintiff's symptom testimony are inadequate, remand for further findings on credibility is appropriate. *See Byrnes v. Shalala*, 60 F.3d 639, 642 (9th Cir. 1995).